## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ELIZABETH KERWIN, on behalf
of the NATIONAL LABOR
RELATIONS BOARD                          Case No. 23-cv-12952-SFC-EAS

     Plaintiff,                          Hon. Sean F. Cox

vs.                                      Magistrate Judge Elizabeth A. Stafford

TRINITY HEALTH-MICHIGAN,
d/b/a Trinity Health Ann Arbor
Hospital,

     Defendant.

| **National Labor Relations Board** | **Butzel Long P.C.** |
|---|---|
| Dynn Nick (P60497) | Terrence J. Miglio (P30541) |
| Attorneys for Plaintiff | Barbara E. Buchanan (P55084) |
| 477 Michigan Ave., Room 05-200 | Attorneys for Defendant |
| Detroit, MI 48226 | 201 W. Big Beaver, Suite 1200 |
| (313) 335-8037 | Troy, MI  48084 |
| Dynn.nick@NLRB.gov | (248) 258-1616 |
| | miglio@butzel.com |
| | buchanan@butzel.com |

## DEFENDANT TRINITY HEALTH-MICHIGAN'S
## RESPONSE TO PLAINTIFF'S PETITION FOR
## PRELIMINARY INJUNCTION [ECF NO. 1]

Defendant, Trinity Health-Michigan, ("the Hospital") by its attorneys, **Butzel Long**, **P.C.** hereby submits its Response to Plaintiff's Petition for Preliminary Injunction [ECF. No. 1, PageID.1-20]. Plaintiff's Petition must be denied because Plaintiff cannot demonstrate that injunctive relief under 20 U.S.C. § 160(j) is

appropriate or warranted.

For those reasons, and for all of the reasons set forth in the accompanying Brief in Support, the Hospital respectfully requests the Plaintiff's Petition be denied in its entirety and that the Hospital be awarded its costs and fees incurred in responding.

Respectfully submitted,

**BUTZEL LONG, a professional corporation**

Dated: December 29, 2023        By:   _/s/ Terrence J. Miglio_
                                      Terrence J. Miglio (P30541)
                                      Barbara E. Buchanan (P55084)
                                      Attorneys for Defendant
                                      201 W. Big Beaver, Suite 1200
                                      Troy, MI  48084
                                      (248) 258-1616
                                      miglio@butzel.com
                                      buchanan@butzel.com

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

ELIZABETH KERWIN, on behalf
of the NATIONAL LABOR
RELATIONS BOARD

       Plaintiff,

vs.

TRINITY HEALTH-MICHIGAN,
d/b/a Trinity Health Ann Arbor
Hospital,

       Defendant.

Case No. 23-cv-12952-SFC-EAS

Hon. Sean F. Cox

Magistrate Judge Elizabeth A. Stafford

| **National Labor Relations Board** | **Butzel Long P.C**. |
|---|---|
| Dynn Nick (P60497) | Terrence J. Miglio (P30541) |
| Attorneys for Plaintiff | Barbara E. Buchanan (P55084) |
| 477 Michigan Ave., Room 05-200 | Attorneys for Defendant |
| Detroit, MI 48226 | 201 W. Big Beaver, Suite 1200 |
| (313) 335-8037 | Troy, MI 48084 |
| Dynn.nick@NLRB.gov | (248) 258-1616 |
| | miglio@butzel.com |
| | buchanan@butzel.com |

# BRIEF IN SUPPORT OF DEFENDANT TRINITY HEALTH-MICHIGAN'S RESPONSE TO PLAINTIFF'S PETITION FOR PRELIMINARY INJUNCTION [ECF NO. 1]

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................iv

CONTROLLING OR MOST APPROPRIATE AUTHORITY ........................... viii

STATEMENT OF ISSUE PRESENTED....................................................ix

I.     INTRODUCTION .................................................................1

II.    STATEMENT OF FACTS .......................................................3

A.     THE HOSPITAL'S OUTPATIENT LAB FACILITIES ...............................3

       i.      Linda Tinsley's Job As Manager Of Phlebotomy.................................5

       ii.     Julie Fuciarelli's Supervisory Job As Section Leader .........................5

       iii.    Supervisor Fuciarelli Engages In Union Organizing Activity And
               The Hospital Invites Employees To Voluntary Informational
               Meetings About Their Federal Rights.....................................6

       iv.     After Being Confronted About Violating Her Supervisor's
               Instructions Concerning The Announcement Of A"Market
               Equity" Wage Increase, Tinsley Announces Her Resignation ............7

       v.      Outpatient Lab Facilities Employees Meet With The Union And
               Discuss Strikes And The Walkout ......................................10

       vi.     The Fraudulent Note Posted In The Reichert Lab .............................10

       vii.    Tinsley's Resignation, The Unlawful Walkout And the
               Celebration At Applebee's ................................................13

       viii.   The Walkout's Impact On Patient Care ...............................20

       ix.     The Union Gathers The Employees To Come to the Hospital On
               March 10th As A Public Relations Stunt .............................22

       x.      The Employees' Terminations .........................................22

       xi.     Evidence Of Union Organizing The Walkout Uncovered During
               the NLRB Hearing.......................................................24

ii

III.    ARGUMENT......................................................................................25

A.    LEGAL STANDARD FOR 10(J) PRELIMINARY INJNUNCTION.........25

B.    PLAINTIFF CANNOT ESTABLISH REASONABLE CAUSE FOR
        INJUNCTIVE RELIEF ..................................................................25

        1.    The Walkout" Was Organized By The Union And Therefore It
               Was Unlawful And Not Protected Activity .........................................26

        2.    There Is Not Reasonable Cause Support Plaintiff's Request For
               Injunctive Relief Because The Employees Were Lawfully
               Terminated For Violation Of The Hospital's Call-Off
               Procedures. ...................................................................................28

        3.    The Walkout Was Unprotected As It Endangered Patient Care.........32

        4.    The Allegations Concerning Tinsley And Fuciarelli Are
               Meritless Because They Are Both Supervisors And Their
               Involvement In The Union Organizing Was Unlawful.......................33

        5.    Plaintiff's Surveillance Claim Is Meritless. .........................................36

        6.    The Informational Meetings Were Not Unlawful.................................38

        7.    The Wage Increase Had No Relation To Alleged Union Activity.
               ..................................................................................................39

        8.    The Hospital's Work Rules Are Lawful And Lawfully Applied........40

C.    PLAINTIFF CANNOT ESTABLISH THAT INJUNCTIVE RELIEF
        IS JUST AND PROPER...................................................................41

D.    IF THIS COURT DOES NOT IMMEDIATELY DISMISS THE
        PETITION AN EVIDENTARY HEARING SHOULD BE HELD. ............47

CONCLUSION .....................................................................................49

## <u>TABLE OF AUTHORITIES</u>

*Ahearn v. Jackson Hosp. Corp.*,
    351 F.3d 226 (6th Cir. 2003)................................................................. 26

*Alan Ritchey, Inc.*,
    354 NLRB 628 (2009) .................................................................... 40

*American Art Clay Company*,
    328 F2d 88 (7th Cir. 1964)............................................................... 31

*Automobile Salesmen's Union Local 1095 v. N.LR.B*,
    711 F.2d 383 (D.C. Cir. 1983) .......................................................... 34

*Babcock & Wilcox Co.*,
    77 NLRB 577 (1946) ..................................................................... 39

*Beasley v. Food Fair of N. Carolina, Inc.*,
    416 U.S. 653, 94 S. Ct. 2023, 40 L. Ed. 2d 443 (1974)................................ 34, 35

*Belcher Towing Co. v. NLRB*,
    726 F.2d 705 (11th Cir.1984)............................................................. 36

*Bethany Medical Center*,
    328 NLRB 1094 (1999) ................................................................... 32

*Beverly California Corp. v. N.L.R.B.*,
    970 F.2d 1548 (6th Cir. 1992)............................................................. 36

*Bob Evans Farms, Inc. v. N.L.R.B.*,
    163 F.3d 1012 (7th Cir. 1998).............................................................. 31

*Boire v. Pilot Freight Carriers, Inc.*,
    515 F.2d 1185 (5th Cir. 1975)......................................................... 43, 45, 46

*Consol. Printers, Inc.*,
    305 NLRB 1061 (1992) ................................................................... 40

*Diaz v. Hartman and Tyner, Inc.*,
    2012 WL 2513485 (S.D. Fla. June 29, 2012) ........................................... 46

*Dobbs House, Inc*,
    325 F2d 531 (5th Cir. 1963).............................................................. 31

*Domestic Linen Supply & Laundry Co. v. Cent. States, Se. & Sw. Areas Pension*
    *Fund*,
    722 F. Supp. 1472 (E.D. Mich. 1989)................................................... 34

*E. Chicago Rehab. Ctr., Inc. v. N.L.R.B.*,
    710 F.2d 397 (7th Cir. 1983)........................................................... 32, 33

*Eisenberg for & on Behalf of N.L.R.B. v. Hartz Mountain Corp.*,
    519 F.2d 138 (3d Cir. 1975).............................................................. 48

*Electrolux Home Prods., Inc.*,
    368 N.L.R.B. No. 34, slip op. at 4 (Aug. 2, 2019)...................................... 30

*Frye ex rel. NLRB v. Specialty Envelope Inc.*,

10 F.3d 1221 (6th Cir. 1993)............................................................... 42

*Frye v. Dist. 1199, Health Care & Soc. Servs. Union, Serv. Emps. Int'l Union,
AFL-CIO,*
996 F.2d 141 (6th Cir. 1993).............................................................. 43

*Union No. 174,*
598 U.S. 771, 143 S. Ct. 1404, 216 L. Ed. 2d 28 (2023)..................................... 32

*Glasser v. Heartland--Univ. of Livonia, MI, LLC,*
632 F. Supp. 2d 659 (E.D. Mich. 2009)............................................. 49

*Gottfried v. Frankel,*
818 F.2d 485 (6th Cir. 1987)............................................................. 42

*Henning & Cheadle, Inc. v. N.L.R.B.,*
522 F.2d 1050 (7th Cir. 1975)........................................................... 32

*In re Alexandria Clinic, P.A.,*
339 NLRB No. 162 (2003) ............................................................... 28

*In Re Oakwood Healthcare, Inc.,*
348 NLRB 686 (2006) ..................................................................... 35

*Intertape Polymer Corp. v. NLRB,*
801 F.3d 224 (4th Cir. 2015)............................................................ 36

*Jeddo Coal Company,*
334 NLRB 677 (2001) ..................................................................... 45

*John Cuneo, Inc.,*
298 NLRB 856 (1990) ..................................................................... 47

*Kreisberg v. Healthbridge Mgmt., LLC,*
732 F.3d 131 (2d Cir. 2013)......................................................... 25, 42

*Lodges 743 and 1746, Intern. Ass'n of Machinists and Aerospace Workers v.
United Aircraft Corporation,*
534 F.2d 422, fn. 39 (2d Cir. 1975) ................................................. 30

*McKinney v. Ozburn-Hessey Logistics, LLC,*
875 F.3d 333 (6th Cir. 2017)....................................................... 26, 31

*McKinney v. Starbucks Corp.,*
77 F.4th 391 (6th Cir. 2023) ........................................................... 42

*Meijer, Inc. v. N.L.R.B.,*
463 F.3d 534 (6th Cir. 2006)............................................................ 31

*Millard Refrigerated Services,*
345 NLRB 1143 (2005) ................................................................... 38

*Minnesota Licensed Prac. Nurses Ass'n v. N.L.R.B.,*
406 F.3d 1020 (8th Cir. 2005)........................................................... 28

*Muffley ex rel. N.L.R.B. v. Voith Indus. Servs., Inc.,*
551 F. App'x 825 (6th Cir. 2014) ...................................................... 47

*N.L.R.B. v. Hartman and Tyner, Inc.,*

714 F.3d 1244 (11th Cir. 2013)......................................................... 46, 48

*N.L.R.B. v. Kentucky River Cmty. Care, Inc.*,
532 U.S. 706, 121 S. Ct. 1861, 149 L. Ed. 2d 939 (2001)................................... 34

*NLRB v. Nueva Eng'g. Inc.*,
761 F.2d 961 (4th Cir. 1985).......................................................... 37

*NLRB v. Rollins Telecasting, Inc.*,
494 F.2d 80 (2d Cir.1974).............................................................. 40

*NLRB v. Southern Md. Hosp. Ctr.*,
916 F.2d 932 (4th Cir.1990)............................................................ 37

*NLRB v. Washington Heights-West Harlem-Inwood Mental Health Council, Inc.*,
897 F.2d 1238, fn. 3 (2d Cir. 1990) ..................................................... 27, 28

*NLRB v. Windsor Indus. Inc.*,
730 F.2d 860 (2d Cir. 1984)............................................................ 40

*NLRB v Family Fare, Inc*,
205 Fed. Appx. 403 (6th Cir, 2006)..................................................... 38

*NLRB v Island Film Processing Co, Inc*,
784 F2d 1446 (9th Cir, 1986).......................................................... 38

*NLRB*,
89 S.Ct. 1918 (1969) ................................................................. 39

*Ontario Knife Co. v. NLRB*,
637 F.2d 840 (2d Cir. 1980)........................................................... 41

*Overstreet v. El Paso Elec. Co.*,
176 Fed. Appx. 607 (5th Cir. 2006)..................................................... 46

*Pearson Educations, Inc.*,
336 NLRB No. 92 (2001) ............................................................. 38

*Pratt Towers, Inc.*,
338 NLRB 61 (2002) ................................................................ 35

*Schaub v. Detroit Newspaper Agency*,
154 F.3d 276 (6th Cir. 1998).......................................................... 47

*Schaub*,
250 F.3d............................................................................. 42

*SEIU, United Healthcare Workers-West v. NLRB*,
574 F.3d 1213 (9th Cir. 2009)......................................................... 27

*Sheeran v. Am. Com. Lines, Inc.*,
683 F.2d 970 (6th Cir. 1982).......................................................... 48

*Smithfield Packing Co. v. N.L.R.B.*,
510 F.3d 507 (4th Cir. 2007).......................................................... 31

*Smithfield Packing, Inc v NLRB*,
510 F3d (4th Cir. 2007)............................................................... 31

*Tschiggfrie Props., Ltd.*,

368 N.L.R.B. No. 120, slip op. at 3-5 ................................................ 30

*Wilshire at Lakewood*,
  343 NLRB 141 (2004) ........................................................... 41

*Wright Line*, 251 NLRB 1083 (1980) enfd. 662 F.2d 899 (1st Cir. 1981), cert.
  denied, 455 U.S. 989 (1982) ............................................... 29, 30

Statutes

20 U.S.C. § 160(j) ........................................................................ 1
29 U.S.C. § 152(11) ................................................................. 34
29 U.S.C. § 158(a)(3) .............................................................. 29
29 U.S.C. § 158(g) ............................................................. 27, 28
29 U.S.C. § 160(c) ................................................................... 48

## <u>CONTROLLING OR MOST APPROPRIATE AUTHORITY</u>

➢ 20 U.S.C. § 160(j)

➢ 29 U.S.C. § 158(g)

➢ *Ahearn v. Jackson Hosp. Corp.*, 351 F.3d 226, 237 (6th Cir. 2003)

➢ *Automobile Salesmen's Union Local 1095 v. N.LR.B*, 711 F.2d 383, 387

   (D.C. Cir. 1983)

➢ *Beverly California Corp. v. N.L.R.B.*, 970 F.2d 1548, 1555 (6th Cir. 1992)

➢ *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1192 (5th Cir. 1975)

➢ *E. Chicago Rehab. Ctr., Inc. v. N.L.R.B.*, 710 F.2d 397, 404 (7th Cir. 1983)

➢ *McKinney v. Starbucks Corp.*, 77 F.4th 391, 397 (6th Cir. 2023)

➢ *McKinney v. Ozburn-Hessey Logistics, LLC*, 875 F.3d 333, 343 (6th Cir.
   2017)

➢ *Meijer, Inc. v. N.L.R.B.*, 463 F.3d 534, 541 (6th Cir. 2006)

➢ *Minnesota Licensed Prac. Nurses Ass'n v. N.L.R.B.*, 406 F.3d 1020, 1025
   (8th Cir. 2005)

➢ *Wright Line*, 251 NLRB 1083 (1980), enfd. 662 F.2d 899 (1st Cir. 1981),
   cert. denied, 455 U.S. 989 (1982)

## <u>STATEMENT OF ISSUE PRESENTED</u>

Whether Plaintiff's request for a preliminary injunction should be denied because there is not reasonable cause that an unfair labor practice occurred?

   Defendant Answers:  Yes

   Plaintiff Answers: No

   This Court Should Answer:  Yes

Whether Plaintiff's request for a preliminary injunction should be denied when it would not be just and proper to award injunctive relief?

   Defendant Answers:  Yes

   Plaintiff Answers: No

   This Court Should Answer:  Yes

Whether the Court should hold an evidentiary hearing to determine whether injunctive relief is appropriate 9 months after the alleged discriminates were discharged for serious rule violations and where the issues involved are factually complex and an evidentiary hearing will aid the court in determining whether any injunctive relief is appropriate?

   Defendant Answers:  Yes

   Plaintiff Answers: No

   This Court Should Answer:  Yes

## I.   <u>INTRODUCTION</u>

Plaintiff's "Petition for Preliminary Injunction Under Section 10(j) of the National Labor Relations Act (NLRA), as Amended" ("Petition") is an untimely and delayed attempt to re-establish a status quo that is no longer present or warranted. Plaintiff's request for 10(j) relief relies almost entirely on the Hospital's termination of twelve employees who walked off their jobs and abandoned patients after receiving false information that their manager Linda Tinsley had been terminated. In fact, Tinsley had voluntarily resigned, slamming her ID badge on a supervisor's desk and walking out.  The employees, working at various locations, abandoned patients who were awaiting critical healthcare services without getting permission from a supervisor and without following the required call-off procedure. Following their walkout, they, along with Tinsley and a union organizer, celebrated their unlawful conduct at a nearby Applebee's restaurant, while confused and angry patients were denied medical testing ordered by their doctors.

SEIU Healthcare Michigan, the union seeking to organize the employees, organized and supported the walkout.  SEIU Healthcare Michigan's involvement in the abandonment of patients is of paramount importance because the NLRA requires that with respect to employees of healthcare facilities such as the Hospital, a union must give 10 days' notice before organizing a strike or work stoppage. If notice is not provided, the strike or work stoppage is unlawful.  Here, no such notice was

provided, the walkout was unlawful and the employees were lawfully discharged.

Despite its involvement in the unlawful walkout, SEIU Healthcare Michigan and Tinsley filed unfair labor practice charges. Subsequently, Plaintiff issued a formal complaint concerning the allegations in the unfair labor practice charges and the matter is currently being adjudicated in a formal hearing before an Administrative Law Judge. Thus far, the hearing has lasted 15 days and is scheduled to resume on January 9, 2024.

Plaintiff cannot establish that there is "reasonable cause" to support 10(j) injunctive relief. The evidence established during the hearing conclusively establishes that the Hospital did not engage in any unfair labor practices and the employees were terminated for serious rule violations unrelated to any union activity. Plaintiff's other allegations of unlawful activity are equally meritless. There is no evidence that the Hospital engaged in unlawful surveillance, implemented an unlawful wage increase, or maintained unlawful work rules.

In addition, Plaintiff cannot establish that 10(j) injunctive relief (*e.g.* reinstatement of the employees) would be "just and proper." First, it would be dangerous and burdensome to reinstate employees who violated their duty to provide critical patient care services and the NLRA expressly prohibits the reinstatement of employees who are discharged for just cause. Second, Plaintiff's severely delayed request for 10(j) injunctive relief has made it impossible to establish a status quo.

Accordingly, Plaintiff's Petition should be denied. If Plaintiff's Petition is not outright denied, the Hospital requests an evidentiary hearing to establish the inappropriateness of injunctive relief.

## II.     STATEMENT OF FACTS

### A. THE HOSPITAL'S OUTPATIENT LAB FACILITIES

The Hospital is a healthcare system that has been recognized by IBM Watson as a Top 100 Hospital and #1 Teaching Hospital. It has been a leading health care provider for more than 100 years, receiving numerous local and national awards recognizing its leadership, quality outcomes, and clinical excellence. The Hospital offers a network of state-of-the-art, full-service laboratories across Michigan. The lab services include a full offering of on-site lab testing as well as stat testing.

The Hospital maintains a well-established Code of Conduct and Guidelines for Employee Conduct and various supplemental policies. In the *Employee Counseling and Corrective Action Policy No. 1036,* walking off the job without permission, constitutes "job abandonment" for which an employee will be terminated. (**Ex. 1**, Employee Counseling and Corrective Action).

The Hospital maintains fourteen outpatient lab facilities in Wayne and Washtenaw counties, including locations in Ypsilanti, Canton, Ann Arbor, Plymouth, Milan, Brighton, Fowlerville, and Livonia. ("Outpatient Lab Facilities") (**Ex. 2**, ALJ Hearing Transcript ("Tr.") at 131). The Outpatient Lab Facilities provide

various critical medical services. (**Ex.** 2, Tr. at 131). Patients are sent to the Outpatient Lab Facilities by their doctors to have their blood drawn, have urine or stool specimens collected and have other testing completed. The samples are sent to the Hospital's main campus for testing. (**Ex.** 2, Tr. at 131). The Outpatient Lab Facilities are strategically located near other hospital facilities and doctors' offices so patients can go directly from their doctors' offices to the Outpatient Lab Facilities, thereby expediting the diagnostic process and causing minimum disruption to the patients. (**Ex. 2**, Tr. at 299-300, 1867). After a patient's is blood drawn or specimen collected, time is of the essence. (**Ex. 2**, Tr. at 314). For example, the industry standard for certain specimens is four hours, meaning the sample should be analyzed within four hours. (**Ex. 2**, Tr. at 314). Many of the patients are being tested or monitored for serious life-threatening medical conditions.

There were 74 employees working at the Outpatient Lab Facilities in March 2023. (**Ex. 2**, Tr. at. 2636) Prior to February 2023, none of the employees at the Outpatient Lab Facilities were members of a union and there had been no known election petitions, or union organizing activity involving those employees. (**Ex. 2**, Tr. at 48). "Lab Techs" at the Outpatient Lab Facilities are responsible for performing phlebotomy (including venipuncture blood draw, capillary puncture, and infant heel sticks), specimen receipt (including urine collection), processing, specimen distribution, computer order entry and requisition completion. (**Ex. 4**, Lab

Tech). "Patient Service Representatives" are responsible for, among other things, interviewing patients and gathering information to assure accurate and timely claims submissions, gather payment and insurance information, and obtaining authorizations for treatments/procedures. (**Ex. 5**, Patient Service Representative).

### i. Linda Tinsley's Job As Manager Of Phlebotomy

At all relevant times Linda Tinsley was the Manager of Phlebotomy over the Outpatient Lab Facilities charged with supervising all blood drawing and specimen collections. (**Ex. 2**, Tr. at 132). She was responsible for staffing those locations, participating in management meetings, preparing budgets and issuing discipline. (**Ex. 2**, Tr. at 132-133).

### ii. Julie Fuciarelli's Supervisory Job As Section Leader

The two other supervisors for Outpatient Lab Facility employees were Julie Fuciarelli and Melissa Reed. They were Section Leaders[1] over the Outpatient Lab Facilities. (**Ex. 2**, Tr. at 770). As a Section Leader, Fuciarelli was responsible for, among other things, review of the day-to-day performance of Lab Tech and Patient Service Representatives relating to quality, promptness, and quantity. (**Ex. 3**, Section Leader). Fuciarelli was tasked with scheduling and assigning work locations for Lab Techs and Patient Service Representatives.[2] (**Ex. 2**, Tr. at 770; **Ex. 3**, Section

---

[1] Section Leaders are also referred to as Team Leads.
[2] The schedules were previously made two weeks at a time, but in January of 2023 Fuciarelli changed the schedules to a month at a time. (**Ex. 2**, Tr. at 845).

Leader). She was also responsible for reassigning employees to different facilities on a daily basis in order to provide coverage for absences (which occurred approximately 100 times between March 2022 and March 2023.) (**Ex. 2**, Tr. at 851). Fuciarelli also had the authority to shut down laboratories if staffing was insufficient. (**Ex. 2**, Tr. at 863-86). Fuciarelli also received and approved/denied time off requests from the Outpatient Lab Facilities' employees. (**Ex. 2**, Tr. at 845). Fuciarelli interviewed potential job candidates and made recommendations about who should be hired and recommendations for promotion, demotion, or termination of Lab Tech and Patient Service Representatives. (**Ex. 2**, Tr. at 852).

### iii. Supervisor Fuciarelli Engages In Union Organizing Activity And The Hospital Invites Employees To Voluntary Informational Meetings About Their Federal Rights

Despite being a supervisor over more than 70 employees, on or about January 27, 2023, Fuciarelli contacted SEIU Healthcare Michigan ("the "Union") via its website. (**Ex. 2**, Tr. at 48). Fuciarelli sought to have the Union organize the Outpatient Lab employees. (**Ex. 2**, Tr. at 48). Emily Ricards, an Union organizer, instructed Fuciarelli to gather her coworkers and attend a meeting on February 27, 2023 at a restaurant in Ann Arbor, Michigan. (**Ex. 2**, Tr. at 48-49). Fuciarelli, along with Ashley Clemens, a Lab Tech Trainer, was extensively involved in Union organizing efforts. (**Ex. 2**, Tr. at 791-793). Clemens was not a supervisor and merely served to provide phlebotomy training to employees. (**Ex. 6**, Lab Tech Trainer).

6

In early February 2023, after learning of potential organizing activity among the Outpatient Lab employees, the Hospital set up informational meetings to educate employees about their rights under federal labor law. (**Ex. 2**, Tr. at 172, 195).[3] Five informational meetings were scheduled at various locations on February 15.  (**Ex. 2**, Tr. at 195, 2549).   During the meetings, employees were offered informational documents that were laid out on a table.  (**Ex. 2**, Tr. at 2552; **Ex. 7**, NLRB Handouts). Employees could then volunteer to read from a summary of the NLRA published by the NLRB. (**Ex. 2**, Tr. at 1015, 1443, 1446, 2552). The other documents available were not read from. (**Ex. 2**, Tr. at 2552). In addition, Michigan's Right to Work law was mentioned as were upcoming legal changes in Michigan. (**Ex. 2**, Tr. at 2552). The meetings were completely voluntary. (**Ex. 2**, Tr. at 198, 203, 2347-2348, 2550). Approximately 22 employees attended.[4] (**Ex. 8**, ACT Meeting Notes).

### iv.   After Being Confronted About Violating Her Supervisor's Instructions Concerning The Announcement Of A "Market Equity" Wage Increase, Tinsley Announces Her Resignation

In December 2022, prior to any union organizing activity at the Outpatient Lab Facilities, the Hospital started the process for a "market-equity" wage adjustment for Outpatient Lab employees as well as for employees working in other

---

[3]The Hospital was not aware at this time that the union organizing drive was initiated and coordinated by its supervisor, Fuciarelli.

[4] Similar meetings are held for employees even when there is no information or rumors about union activity. (**Ex. 2**, Tr. at 2456).

classifications and Hospital locations. (**Ex. 2**, Tr. at 1614).  This process began after the problems encountered in hiring and retaining qualified candidates was discussed at a meeting between Amber Coon[5] (Colleague and Labor Relations Partner), Isabel Gauss (Executive Director for Lab Operations), and other members of Hospital management. (**Ex. 2**, Tr. at 1615).  On December 8, 2022, the market-equity wage adjustment process was initiated when Gauss submitted a Situation Background Assessment and Recommendation ("SBAR").  (**Ex. 2**, Tr. at 1614-1615, 2554). After the SBAR is submitted, it goes to the Hospital's Compensation Committee and if approved by the Compensation Committee, it goes to the Michigan Regional Workforce Management Committee. (**Ex. 2**, Tr. at 1616).  The market-equity adjustment generally takes 4-6 months to complete. (**Ex. 2**, Tr. at 2337, 2556).

In late February 2023, the market-equity wage adjustment was approved for implementation in April 2023. (**Ex. 2**, Tr. at 2555-2556). Upon approval, the Human Resources Colleague Labor Relations Representative ("CLR") responsibile for the department(s) where the adjustment will be implemented provides department leaders with information regarding the adjustment each employee will receive, as well as talking points. (**Ex. 2**, Tr. at 1617). The leaders are expected to have a one-on-one conversation with each employee letting him or her know how they will be affected by the adjustment. (**Ex. 2**, Tr. at 1617). This was the process followed for

---

[5] Coon was formerly known as Amber Sotelo.

last market equity adjustment Outpatient Lab employees in December 2020. (**Ex. 2**, Tr. at 1617, 2338). On February 24, Gauss informed the relevant managers, including Tinsley, of the market-equity wage adjustment. (**Ex. 2**, Tr. at 2352). Despite clear instructions from Gauss that the wage adjustment was not to be announced in writing, Tinsley emailed all Outpatient Lab Facilities employees on February 28 indicating that the employees were "under a review for an hourly wage increase in Early March" and that if the employees did not update their "experiences, skills, job history, etc." on Workday[6] they would be "putting yourself at risk on possibly missing out on a wage increase." (**Ex. 9**, Feb. 28, 2023 Email).  The email was immediately raised to Gauss' and Tonia Schemer's (CHRO) attention by another lab manager. (**Ex. 2**, Tr. at 1617-1618). Not only was the email improper because employees are to be notified personally about their compensation adjustment by their manager, Tinsley's email was also inaccurate: market-equity wage adjustments are not tied to whether an employee updates their Workday profile. (**Ex. 2**, Tr. at 1618-1619, 1694-1695, 2349-2350).

Upon learning of Tinsley's improper email, Gauss and Coon met with her. (**Ex. 2**, Tr. at 2352). Tinsley became defensive about her inappropriate email and abruptly informed Gauss and Coon she would be resigning to accept a position at

---

[6] Workday is an internal platform used to record employees' experiences and job information (**Ex. 2**, Tr. at 346, 2344).

9

the University of Michigan. (**Ex. 2**, Tr. at 2353, 2569). Tinsley said she would stay until David Everett's (Regional Lab Director) retirement at the end of May.  (**Ex. 2**, Tr. at 2569). Tinsley angrily ended the meeting. (**Ex. 2**, Tr. at 2353, 2570).

### v.  Outpatient Lab Facilities Employees Meet With The Union And Discuss Strikes And The Walkout

On February 27th, the day prior to Tinsley's misleading email regarding the market-equity wage adjustment, a number of Outpatient Lab Facilities employees met with union organizer Ricards at a restaurant in Ann Arbor.  (**Ex. 2**, Tr. at 49). During the meeting, Ricards discussed strikes and walkouts with the employees. (**Ex. 2**, Tr. at 88-89). On March 1st, employees informed Tinsley that they were planning a walkout strike. (**Ex. 2**, Tr. at 253).

### vi.  The Fraudulent Note Posted In The Reichert Lab

On March 7, 2023, during a meeting between Tinsley, Gauss, Everett, and Coon, Tinsley mentioned that an altered email was pinned on the Reichert Lab Communications Board purporting to be from Tinsley. ("Fraudulent Note") (**Ex. 2**, Tr. at 232-233)(**Ex. 10**, Fraudulent Note). The Fraudulent Note said:

> Productivity expectations for Reichert and Canton: Draw 7-10 patients per hour based on patient volume.  In closely monitoring activity, there are too many Lab Techs not meeting these expectations. I will be holding back your March hourly wage increase if all any [sic] of your performance expectations are not met. Thank you for your prompt attention to this important message.

> Tinsley said the Fraudulent Note was brought to her attention by Fuciarelli –

10

the employee who initiated the union organizing. (**Ex. 2**, Tr. at 2577). Tinsley vehemently denied drafting or posting the note. (**Ex. 2**, Tr. at 247, 2575). The Hospital took the Fraudulent Note very seriously for multiple reasons. (**Ex. 2**, Tr. at 2360). First, it impersonated a supervisor. (**Ex. 2**, Tr. at 2360, 2574). Second, the information within it was incorrect. (**Ex. 2**, Tr. at 2360). The Hospital does not link market equity adjustments or any raise to performance or productivity. (*Id.*). In fact, in the healthcare industry, linking employees' compensation to productivity can be unlawful. (*Id.*). Finally, the Hospital was aware that there was union activity and believed the Fraudulent Note could be viewed as an attempt to threaten and retaliate against employees for engaging in union activity by threatening that Tinsley would withhold raises unless employees met alleged productivity standards. (*Id.*). The Hospital felt the Fraudulent Note was intended to create extremely negative sentiment towards Hospital management among employees considering union membership. (**Ex. 2**, Tr. at 2779).  As a result, the Hospital immediately launched an investigation into the Fraudulent Note. (**Ex. 2**, Tr. at 2360-2361). Since Tinsley had initially indicated the Fraudulent Note was placed on the Communications board during the shift prior to her learning of it, Coon began working with Tinsley to identify staff who had worked that shift. (**Ex. 2**, Tr. at 2361, 2575).

Tinsley dragged her feet in providing information to Coon. She first claimed that she could not identify a schedule of the employees that were working at that

time.  (**Ex. 2**, Tr. at 2579). She then told Coon there was a notebook that was used to list the names of the employees who had called off during the shift when the Fraudulent Note was posted. (**Ex. 2**, Tr. at 2579-2580). Information in the Notebook would have narrowed the number of employees that Coon would have to interview since they were not working when the Fraudulent Note was posted. Coon asked Tinsley to provide the notebook. (**Ex. 2**, Tr. at 2580, 2582, 2588-2589). In response, Tinsley searched for the notebook. (**Ex. 2**, Tr. at 561, 598). Tinsley located a notebook out in the open in her office and discovered it had a list of employee names and "$55" written in the top.  (**Ex. 11**, Notebook; **Ex. 12**, Mar. 8, 2023 Email; **Ex. 2**, Tr. at 574, 2447). The office was used by Tinsley and the two supervisory Section Leaders, Fuciarelli and Reed. (**Ex. 2**, Tr. at 436). It was sitting on a filing cabinet, in the open. (**Ex. 2**, Tr. at 561, 2447). Tinsley then took a picture of the notebook, returned the notebook, and notified Gauss and Everett. (**Ex. 2**, Tr. at 243, 444, 249).

On March 8, at 5:43 am, Tinsley texted Gauss indicating that she had "new information." (**Ex. 2**, Tr. at 2362; **Ex. 13**, Mar. 8 Text). In response, Gauss asked Tinsley to call her. (**Ex. 13**). During the conversation, Tinsley indicated that she was looking for the schedule to determine which employees that had worked that previous shift for Coon's investigation of the Fraudulent Note. (**Ex. 2**, Tr. at 2366). Not having received the notebook, Coon again requested that Tinsley provide it. (**Ex. 14**, Text Messages). Coon also contacted the security department to determine if

there was video footage of the Communications board. (**Ex. 2**, Tr. at 2577-2578). Eventually, Everett, Coon, and Gauss requested that Tinsley send a picture of the notebook. (**Ex. 14**, Text Messages). Tinsley did not send the picture, but instead left the Hospital around 2:00 pm, to visit a friend. (**Ex. 2**, Tr. at 249-250, 2592).

Because Tinsley initially indicated she would send the photo and then stalled and never sent it, Coon and Everett went to the office to locate the notebook. (**Ex. 2**, Tr. at 2599). Coon and Everett entered the office and looked for the notebook on top of a bookshelf, a file cabinet, and on Tinsley's desk where Tinsley said she had found it. (**Ex. 2**, Tr. at 1955-1956, 2601-2602). Coon and Everett were in the office for around five minutes and then left after not finding the notebook. (**Ex. 2**, Tr. at 2603). Neither looked into any employee's personal belongings. (**Ex. 2**, Tr. at 1956, 2603).

Around 7:00 pm, Everett texted Tinsley requesting she send the picture of the notebook. (**Ex. 15**, Texts Between Everett and Tinsley). Tinsley never sent the picture. (*Id*.). Instead Tinsley texted Everett that she will "resign effective very soon" and that she will be "writing [her] letter of resignation tomorrow" purportedly because she was upset that Coon and Everett went to find the notebook. (*Id*.). **<u>Tinsley then revealed the Outpatient Lab Facilities employees were "planning a walkout."</u>** (*Id*.). Tinsley further stated that she "will vacate [her] position in May" but "can leave sooner if HR wishes." (*Id*.).

      **vii. Tinsley's Resignation, The Unlawful Walkout And the Celebration At Applebee's**

At around 7:30 the morning of March 9, Tinsley met with Everett, Gauss, and Coon at the Reichert Lab. (**Ex. 2**, Tr. at 1961). Gauss began the meeting by asking that everyone take a deep breath and reiterating that the Hospital supported Tinsley. (**Ex. 2**, Tr. at 2381). Gauss then asked Tinsley why she did not send the picture of the notebook. (**Ex. 2**, Tr. at 1962). In response, Tinsley claimed that she did not know how to send the picture and felt uncomfortable sending it. (**Ex. 2**, Tr. at 1962, 2382). Tinsley then became very angry and said she was resigning. She slammed her ID badge on the desk and walked out of the room. (**Ex. 2**, Tr. at 1963, 2382-2383). Everett followed Tinsley out of the room to get her laptop. (**Ex. 2**, Tr. at 1963). After returning her laptop to Everett, Tinsley apologized to Everett for "leav[ing] you with this mess." (**Ex. 2**, Tr. at 1964). Tinsley then left the building. (**Ex. 2**, Tr. at 1964). Fuciarelli indicated that she was walking out with Tinsley. Everett requested that Fuciarelli and the other Lab Techs think of the patients and stay, but Fuciarelli and a few other employees left in direct defiance of Everett's direction. (**Ex. 2**, Tr. 1963-1969).  Although Everett sat at Tinsley's desk throughout the day, not a single employee called Everett seeking permission to leave their shift. (**Ex. 2**, Tr. at 1971).

By the time Coon returned to her office after the meeting with Tinsley, she was informed that more employees had abandoned their jobs. (**Ex. 2**, Tr. at 2614). Coon and her HR colleagues Lerita McElroy (Colleague Relations and General Partner) and Caryl Williams-Bell (Colleague Relations and General Partner) quickly

14

left for the other locations to assess the situation. (**Ex. 2**, Tr. at 2244-2245, 2616).

Coon and her colleagues first visited the Arbor Park lab at 9:00 a.m. (**Ex. 2**, Tr. at 2246, 2617-2618).  They observed the location was closed, and patients were waiting in the parking lot. (**Ex. 2**, Tr. at 2246). Coon and her colleagues went to the Canton lab fifteen to twenty minutes later. (**Ex. 2**, Tr. at 2247). Most employees had remained at that location. (**Ex. 2**, Tr. at 2248). While the HR group was there, an employee, Jillian Patterson was allowed to leave after she contacted Gauss for permission. (**Ex. 2**, Tr. at 2250, 2253). Finally, Coon and her colleagues visited the Plymouth lab. (**Ex. 2**, Tr. at 2257). The employees there were very emotional. One employee, Andrea Martin was very loud and could be heard yelling and cussing from the patient's area. (**Ex. 2**, Tr. at 2257-2258). Due to the employees' alleged inability to perform their duties, Gauss authorized the employees at the Plymouth location to finish up the labs, all other patient duties, and close the location. (**Ex. 2**, Tr. at 2263).

In total, 12 employees abandoned their jobs and patients without getting permission from a supervisor. None of those employees contacted Gauss or Everett before abandoning their shift even though each Outpatient Lab Facility has a list of the phone numbers for management and employees have access to such information through the Hospital's computer system. (**Ex. 2**, Tr. 2540-2542; **Ex. 16**, Contact List). In addition, employees can hover a cursor over an email address and it will show the names of managers up the employee's chain of command. (**Ex. 2**, Tr. 2541-

2542).   While some employees claimed that Clemens authorized them to walk off **Clemens was not a supervisor or manager and did not have authority to authorize an employee to leave or to close a lab.** (**Ex. 2**, Tr. 1831). **The established procedure for an employee to leave his/her shift early is to contact a manager and speak with them directly.** (**Ex. 2**, Tr. 2468, 1193, 2657-2658).

**Julie Fuciarelli:** On March 9, Supervisor Fuciarelli walked out with Tinsley. (**Ex. 2**, Tr. at 812-13). She did not stay despite the request from her Everett's plea to "think of the patients" (**Ex. 2**, Tr. at 812).

**Sean Wood:** Wood was a Lab Tech 1 at the Canton lab. (**Ex. 2**, Tr. at 1261; 1266). On March 9, Wood learned that Tinsley had either been fired or quit. (**Ex. 2**, Tr. at 1266-67). Wood proceeded to call the Reichert Lab and tell another Lab Tech, that he was leaving work. (**Ex. 2**, Tr. at 1269, 2743). Wood then left work despite the fact every other time he left work early he had spoken to a manager to get permission to leave. (**Ex. 2**, Tr. at 1261). Wood then went to Applebees to celebrate with the other employees, Tinsley and organizer Ricards. (**Ex. 2**, Tr. at 1355-1356)

**Larissa Luff:** Luff was a part-time Lab Tech at the West Arbor lab. (**Ex. 2**, Tr. at 1142-43). On March 9, Luff claimed to have heard Clemens[7] on a speaker phone in the break room telling the Lab Techs that Tinsley had been fired and they

---

[7] Importantly, Clemens was also leading the union organizing activities with Fuciarelli.

could go home if they wanted a "mental health day." (**Ex. 2**, Tr. at 1067-1068, 1148). Luff was also involved in kicking the patients out of the waiting room after which she clocked out, and went to Applebee's. (**Ex. 2**, Tr. at 935-936, 1149-50).

**Matthew Miller**:  Miller was a Lab Tech 2 at the West Arbor lab. (**Ex. 2**, Tr. at 918).  On March 9, Miller also claimed he heard Clemens on speaker phone telling the Lab Techs that Tinsley had been fired and they could go home if they wanted a "mental health day." (**Ex. 2**, Tr. at 930-931, 1067-1068). Miller testified that he and the other employees kicked three to four patients out of the waiting room and went to Applebee's to drink alcohol because "they were looking for a place to get Linda a drink." (**Ex. 2**, Tr. at 935-936).

**Karah Vallely:**  Vallely abandoned her shift after hearing the misinformation that Tinsley was terminated. (**Ex. 17**, Interview Notes, R-50 Vallely). She left without contacting any supervisor for approval. (*Id.*) Vallely further explained that she called her sister, who instructed her to leave if no supervisor was present. (*Id.*)

**Tiffany Hammoud:**  Hammoud was a Patient Service Representative at the West Arbor location.  (**Ex. 2**, Tr. at 1063). Shortly after the location was opened, she received a call from Clemens, gathered the other employees in the breakroom, and put Clemens on speaker phone. (**Ex. 2**, Tr. at 1067-1068). Clemens allegedly told all the Lab Techs listening in that Tinsley had been fired and they could go home if they wanted a "mental health day." (**Ex. 2**, Tr. at 930-931, 1067-1068). Hammoud

carpooled with Miller to Applebee's to drink alcohol because "they were looking for a place to get Linda a drink." (**Ex. 2**, Tr. at 935-936, 1072)

**Deb Holbrook**: Holbrook was a Lab Tech 1 at the Milan lab. (**Ex. 2**, Tr. at 1006). On March 9, Holbrook overheard a coworker talking on a phone say that the West Arbor location had closed. Holbrook then instructed the coworker to tell the person on the other side of the phone that Holbrook was leaving. (**Ex. 2**, Tr. at 1007-1008). Holbrook did not know the reason for Tinsley's resignation until after she abandoned her job. (**Ex. 2**, Tr. at 1041). After leaving her job without permission, Holbrook met up with her colleagues at Applebee's. (**Ex. 2**, Tr. at 1042-1043).

**Tatiana Trombly**: Trombley was a Lab Tech 2 at the West Arbor location. (**Ex. 2**, Tr. at 687). Shortly after arriving for work, Trombly heard Clemens on speaker phone when Clemens allegedly told all the Lab Techs listening in that Tinsley had been fired and they could go home if they wanted a "mental health day." (**Ex. 2**, Tr. at 688-689, 1067-1068). Along with the other employees, Trombly kicked patients out of the waiting room, clocked out and went to Applebee's because "they were looking for a place to get Linda a drink." (**Ex. 2**, Tr. at 935-936, 1072).

**Kimberly Carrington:** Carrington was a Lab Tech 1 at the Arbor Park lab. (**Ex. 2**, Tr. at 1410, 1418). On March 9, Carrington arrived at her scheduled time of 8:30 am. (**Ex. 2**, Tr. at 1419). Shortly thereafter, she received a call from an unknown individual who indicated that they needed to close the location. (**Ex. 2**, Tr. at 1419-

1420, 1422). Carrington did not ask any questions as to why or ask who was calling. (**Ex. 2**, Tr. at 1422). After the call, she immediately began closing the lab and went home. (**Ex. 2**, Tr. at 1422-1423). She said she had "absolutely no conversation" with coworkers regarding leaving and she wanted to go home to take care of her puppy. (**Ex. 2**, Tr. at 1451-1453). After getting home, Carrington joined her colleagues at Applebee's after receiving numerous calls to come there. (**Ex. 2**, Tr. at 1454-1457).

**Heather Nielsen**: Nielsen was a Patient Services Representative at the Domino Farms lab. (**Ex. 2**, Tr. at 583, 592-593). On March 9, Nielsen claims to have received a phone call from Clemens who informed her that Tinsley had walked out and said, "you do what you need to do." (**Ex. 2**, Tr. at 594). Nielsen claims she had anxiety and therefore could not do her job. (**Ex. 2**, Tr. at 594). Nielsen punched out and then joined her coworkers at Applebee's, despite not having permission or authority from management to leave her shift.  (**Ex. 2**, Tr. at 595).

**Louise Joplin:** Joplin was a Lab Tech at the Reichert Lab. (**Ex. 2**, Tr. at 1243). On March 9, Joplin was at work when Tinsley stormed out of her office while Joplin was hanging up her coat. (**Ex. 2**, Tr. at 1247-1248). Joplin then went to the bathroom and Tinsley was gone by the time she came out. (**Ex. 2**, Tr. at 1248). At that point, Joplin claimed she had a bad headache, so she informed to coworkers not management, she was going home. (**Ex. 2**, Tr. at 1249). Joplin acknowledged that she only went home on March 9 due to her headache. (**Ex. 2**, Tr. at 1253).

**Megan Terrell-Johnson:** Terrrell-Johnson was a Lab Tech at the West Arbor lab. (**Ex. 2**, Tr. at 1347). On March 9, Terrell-Johnson was in the back room of the lab listening to Clemens on speaker phone. (**Ex. 2**, Tr. 1352). Clemens allegedly told the Lab Techs listening in that Tinsley had been fired and they could go home if they wanted a "mental health day." (**Ex. 2**, Tr. at 1352, 1067-1068).  Terrell-Johnson then decided to leave work and go to Applebee's with her coworkers. (**Ex. 2**, Tr. 1355).

Despite offering a number of fabricated excuses for walking out on patients, the employees were well enough to attend an 11:00 am meeting on March 9th at Applebee's to eat and drink.  (See e.g. **Ex. 2**, Tr. 971-972, 1109, 1458-1459).  Union organizer Ricards showed up at Applebee's to speak with the employees. (**Ex. 2**, Tr. 77-78). The employees stayed at Applebee's for several hours. (**Ex. 2**, Tr. 86) Nielsen testified that Ricards told employees that a 10-day notice was required under the Act before the walkout, specifically "[i]n fact, when they found out that we had walked out, she said that we need to give a ten-day notice before." (**Ex. 2**, Tr. 640).[8] It eventually got back to the Hospital that the employees were celebrating at Applebee's because they walked out. (**Ex. 2**, Tr. 2505-2506).

### viii.  The Walkout's Impact On Patient Care

The importance of the health care services provided by the Outpatient Lab

---

[8] Ricards acknowledged that in a healthcare setting before a strike occurs the union must provide a 10-day notice. (**Ex. 2**, Tr. 51).

Facilities cannot be understated or disputed. Medical services provided at the labs not only detect serious illnesses like cancer but also detect life threatening issues like sepsis or a GI bleed. (**Ex**. **2**, Tr. at 1867-68). The majority of patients that come to an Outpatient Lab Facilities for testing are elderly. (**Ex**. **2**, Tr. at 1868). These patients are more prone to genetic mutation, which results in various types of cancer. (**Ex**. **2**, Tr. at 1868-69). The services are critical to treating serious conditions such as cancer and leukemia for patients of all ages. (**Ex**. **2**, Tr. at 1860-1866). That is precisely why the labs are located near physician offices so that patients are not burdened with excessive travel and medical needs can be timely addressed. (**Ex**. **2**, Tr. at 1869-1870). If samples are not timely and properly handled, it can lead to false results. (**Ex**. **2**, Tr. at 1870). Thus, when Outpatient Lab Facilities unexpectedly close, it causes a great burden on patients and can detrimentally affect their care.

The employees' unlawful walkout left patients stranded and dramatically cut off critical medical services to a large the number of patients. For example, at the Arbor Park lab, there were 59 blood draws on March 8 and only one blood draw on March 9. (**Ex**. **2**, Tr. 2509; **Ex. 18**, Blood Draw Graph). At the Domino Farms lab there were 99 blood draws on March 8 and only 76 blood draws on March 9. (**Ex. 18**). At the Canton lab, there were 132 blood draws on March 8 and only 111 blood draws on March 9. (**Ex. 18**). At the Milan location, the location performed 89 blood draws on March 8 and only 76 blood draws on March 9. (**Ex. 18**).

### ix.  The Union Gathers The Employees To Come to the Hospital On March 10th As A Public Relations Stunt

After the Walkout on March 9th, the Hospital's HR colleagues reviewed the Outpatient Facilities' employees' time records to determine who abandoned their shift. (**Ex. 2**, Tr. 2269, 2636-2637). The HR team then called the employees who abandoned their work and informed them that they were not to return to work until the completion of the investigation.  (**Ex. 2**, Tr. 2270).[9]

Despite the instruction not to appear for work, the next morning, a group of employees, organized by the union, appeared at the Hospital in Reichert Lab patient care area. (**Ex. 2**, Tr. 63-64, 985, 1111; **Ex. 19**, Press Release). The union and employees met at a diner before arriving at the lab. (**Ex. 2**, Tr. 1046). The Union instructed the employees what to say during the visit. (**Ex. 2**, Tr. 1047). The group posed for a photo, and were videotaping the event despite strict Hospital rules and HIPAA regulations prohibiting video in patient care areas. (**Ex. 2**, Tr. 2653-2654) The group finally left after roughly 25 minutes. (**Ex. 2**, Tr. 64-65). However, while there, Bob King, acting as an agent for the Union, threatened to divert business from the Hospital if the employees were not returned to work. (**Ex. 2**, Tr. 2282-2283).

### x.  The Employees' Terminations

---

[9] This instruction was particularly important due to the fact that the employees work in patient care areas and The Hospital was seeking to avoid any further patient care disruptions. (**Ex. 2**, Tr. 2649-2650)

On March 13, 14, and 15, the Hospital's HR team began interviewing the employees that had walked off the job on March 9. (**Ex**. **17**, Interview Notes). Several of the employees claimed they had "permission" to leave from Clemens, while others claimed they did not get permission from anyone. (*Id.*). Clemens was interviewed twice, on March 10 and again on March 15, and on both occasions told HR and management she had not given any employee permission to leave. (**Ex**. 17, Interview notes–R-75; **Ex**. **2**, Tr. 2668-2670). Regardless, the Outpatient Lab Facilities procedures required employees get permission <u>from a supervisor</u> before leaving work. If no supervisor was available, employees were required to move up the supervisory chain to get permission from a member of management to leave. After the investigation was completed the employees who failed to follow the call-off procedure were terminated for job abandonment under Hospital Human Resources Policy 1036 *Employee Counseling and Corrective Action*. (**Ex. 1; Ex. 20,** Termination Letters). Not all the employees who were part of the investigation were eventually terminated. (**Ex. 2**, Tr. 2640, 2653). In fact, the investigation revealed some employees followed the correct call-off procedure. (**Ex. 2**, Tr. 2640-2641).

**<u>Significantly, many of the terminated employees have said they have no interest in returning to the Hospital</u>**: Fuciarelli (said "absolutely not!" when asked about reinstatement), Hammoud ("I also said I wouldn't come back [to The Hospital]") Matthew Miller (said "no" to the idea of reinstatement), Nielsen ("I do

not want my job back."), Terrell-Johnson (said "nope" to the idea of reinstatement). (**Ex. 21**, Subpoena Response Excerpts). Additionally, Sean Wood said he was "on the fence" about returning to The Hospital because he "want[s] to see The Hospital pay for this!!"). (**Ex. 21**).[10]

### xi. Evidence Of Union Organizing The Walkout Uncovered During the NLRB Hearing

After the NLRB issued a formal complaint, the matter proceeded to a hearing before an Administrative Law Judge. The hearing began on September 26, 2023. (**Ex.** 2, Tr. 1). Currently, there has been 15 days of witness testimony. (**Ex.** 2, Tr. 2676).  The hearing is set to resume on January 9, 2024.  Evidence presented at the hearing establishes the Union organized the walkout:

- **A text message was uncovered wherein Clemens acknowledges that she should have listened to the union and left with the rest of the employees.** (**Ex. 22**, Clemens Text Messages)(emphasis added).

- **A recorded phone conversation between Hammoud and Clemens reveals that the union organized the walkout and instructed Clemens to stay and not participate in the Walkout.  Specifically, Clemens stated, "<u>I wish I just would have f****** left and not even listen to – I mean, the union rep.</u>"** (**Ex.** 23, Call Transcript)(Emphasis added).

- **In a group text message with Ricards, a terminated employee states that the Union "advised [the employee] to stay and basically be a double agent[.]"** (**Ex.** 24, Group Chat).

---

[10] Many of the terminated employees have found other jobs.

- **In a text message between Fuciarelli and Ricards, Fuciarelli states the Union directed Clemens to stay during the Walkout to "HELP us" because the employees claim they are "at WAR not on PTO" relating to the Walkout. (Ex.** 24, Group Chat). **Fuciarelli's message further confirms the employees were "in contact quite frequently with this union."**

Together with Tinsley's text the day before, stating the employees were planning a walkout, the evidence establishes the Union's active role in organizing the walkout in violation of the NLRA, rendering the employees' conduct unlawful.

## III.   ARGUMENT

### A.   LEGAL STANDARD FOR 10(J) PRELIMINARY INJNUNCTION

A 10(j) injunction "is an extraordinary remedy." *Kreisberg v. Healthbridge Mgmt., LLC*, 732 F.3d 131, 141 (2d Cir. 2013). With respect to §10(j) injunctions, the Sixth Circuit utilizes the "reasonable cause/just and proper" standard requiring that a district court find (1) "reasonable cause" to believe that unfair labor practices have occurred, and that (2) injunctive relief with respect to such practices would be "just and proper." *Ahearn v. Jackson Hosp. Corp.*, 351 F.3d 226, 237 (6th Cir. 2003).

### B.   PLAINTIFF CANNOT ESTABLISH REASONABLE CAUSE FOR INJUNCTIVE RELIEF

To obtain 10(j) injunctive relief, the Regional Director must establish reasonable cause that an unfair labor practice occured. The Regional Director "must also show that the facts of th[e] case are consistent with the Board's legal theory." *Id*. A District Court's review of a 10(j) petition is "not without teeth." *McKinney v. Ozburn-Hessey Logistics, LLC*, 875 F.3d 333, 343 (6th Cir. 2017). A 10(j) injunction

is properly denied in situations where the court is presented with "virtually no evidence to support the injunction" compared to "plenty of evidence that [the] termination was justified." *Id.* The termination of these employees was for their actions in clearly and unlawfully abandoning their jobs and the patients they had a duty to serve.

There are two alternate determinations as to the Hospital's action in terminating the employees, both of which eviscerate Plaintiff's effort to establish reasonable cause: (a) either the walkout was not protected because it did not constitute protected concerted activity under the NLRA, or; (b) the walkout was organized by the Union and was thus unlawful because the Union did not provide the required 10-day notice under section 8(g) of the NLRA. Under either determination the employees are lawfully subject to discharge.

## 1. The Walkout" Was Organized By The Union And Therefore It Was Unlawful And Not Protected Activity

In order to protect health care facilities from sudden disruptive strikes and picketing, which compromises patient care, Congress added special notice and mediation provisions to the National Labor Relations Act ("Act"). Subsection 8(g) of the NLRA requires unions to provide health care institutions such as the Hospital with at least ten days' notice before engaging in a concerted refusal to work. 29 U.S.C. § 158(g); *NLRB v. Washington Heights-West Harlem-Inwood Mental Health Council, Inc.*, 897 F.2d 1238, fn. 3 (2d Cir. 1990)("The 10-

day notice is intended to give health care institutions sufficient advance notice of a strike or picketing to permit them to make arrangements for the continuity of patient care"); *SEIU, United Healthcare Workers-West v. NLRB*, 574 F.3d 1213, 1216-1219 (9th Cir. 2009)(holding union's actions in orchestrating members' collective refusal to work overtime after only four-day notice to hospital constituted "concerted refusal to work," in violation of NLRA provision requiring 10-day notice of planned work stoppage). Specifically, 8(g) provides that "[a] labor organization before engaging in any strike, picketing, or other concerted refusal to work at any health care institution shall, not less than ten days prior to such action, notify the institution in writing[.]" **Employees engaging in concerted refusals to work that do not follow the requirements of 29 U.S.C. 158(g) lose the protections under the Act and can be lawfully terminated**. *In re Alexandria Clinic, P.A.*, 339 NLRB No. 162 (2003); *see also Minnesota Licensed Prac. Nurses Ass'n v. N.L.R.B.*, 406 F.3d 1020, 1025 (8th Cir. 2005) (striking nurses lost protection of Act and were subject to discharge when they did not give required section 8(g) notice); *N.L.R.B. v. Washington Heights-W. Harlem-Inwood Mental Health Council, Inc.*, 897 F.2d 1238, 1248 (2d Cir. 1990) (denying enforcement of Board order reinstating 34 striking employees where required 8(g) notice was not given).

It is undisputed that the required 10-day notice was not provided prior to the walkout. There is substantial evidence of the Union's involvement in organizing the

walkout. Nielsen confessed that during the meeting at Applebee's following the walkout, Ricards, the union organizer, acknowledged the 10-day notice was required.  (**Ex. 2**, Tr. 640). Moreover, in a text message Clemens acknowledged that she should have listened to the union and left with the rest of the employees, thus establishing without any doubt that the union had full knowledge of and played a role in the walkout. (**Ex. 22**). In wholly separate text messages, Fuciarelli acknowledged that the employees were in frequent contact with the Union and the employees were at "War not on PTO." (**Ex. 24**).  Moreover, the Union's organization and coordination of the group appearing at the Hospital on the morning of March 10 further establishes it the Union's direction of the employees. The Union's website points to the conclusion that the union organized and supported the Walkout. (**Ex. 19**, Press Release). The circumstances of this case are precisely why Congress included the strict notice provisions in Section 8(g): to prevent patient abandonment – *e.g.* leaving patients in waiting rooms and parking lots and locking medical facilities. Accordingly, the walkout was not protected activity under the NLRA.

## 2. There Is Not Reasonable Cause Support Plaintiff's Request For Injunctive Relief Because The Employees Were Lawfully Terminated For Violation Of The Hospital's Call-Off Procedures.

Section 8(a)(3) of the Act provides, in relevant part, that "it shall be an unfair labor practice for an employer . . . by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage

membership in any labor organization." 29 U.S.C. § 158(a)(3). The Board's approved standard for cases turning on employer motivation – whether 8(a)(3) or 8(a)(1) cases – is found in *Wright Line*, 251 NLRB 1083 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), *cert. denied*, 455 U.S. 989 (1982).

The General Counsel of the NLRB carries the burden of persuading by a preponderance of the evidence that employee protected conduct was a substantial or motivating factor (in whole or in part) for the employer's adverse employment action. *Wright Line,* 251 NLRB at 1089.  The General Counsel must show that: (i) the employee engaged in protected concert activity; (ii) the employer had knowledge of that activity; (iii) the employer bore antiunion animus. Evidence of employer's preference for a non-union workforce is not sufficient. *See Tschiggfrie Props., Ltd.*, 368 N.L.R.B. No. 120, slip op. at 3-5, 8-11 (Nov. 22, 2019*); see also Electrolux Home Prods., Inc.*, 368 N.L.R.B. No. 34, slip op. at 4 (Aug. 2, 2019)(holding that evidence of pretext insufficient to support an inference of unlawful motive as a matter of law.). Once the General Counsel makes the required showing, the employer must establish that it would have taken the same action even in the absence of the employee's protected union activity *Wright Line*, 251 N.L.R.B. at 1088-89.

In the instant case, a threshold defect in the Plaintiff's case is that the terminated employees did not engage in protected concerted activity. Each employee left their position without obtaining permission for what they admitted were their

own personal reasons, not the terms and conditions of their employment. *Lodges 743 and 1746, Intern. Ass'n of Machinists and Aerospace Workers v. United Aircraft Corporation*, 534 F.2d 422, fn. 39 (2d Cir. 1975)("Of course, absence from work because of personal reasons unrelated to the strike or fear of violence is not protected activity, and had the Company chosen to terminate these individuals, nothing in the National Labor Relations Act would have prevented it from doing so.") Not a single terminated employee indicated they were leaving for any union related reason or due to safety concerns. Each employee testified that they individually decided they would not work any further that day for their own personal reasons. To the extent the employees claim they left in protest in response to the misinformation that Tinsley had been fired, the walkout would still be unprotected. *See Bob Evans Farms, Inc. v. N.L.R.B.*, 163 F.3d 1012, 1024 (7th Cir. 1998) (employee walkout over supervisor's termination was not protected under the Act); *Smithfield Packing Co. v. N.L.R.B.*, 510 F.3d 507, 520 (4th Cir. 2007).

While Tinsley maintains she resigned in protest of the search for the notebook, the Hospital was fully entitled (if not obligated) to investigate the Fraudulent Note and possible supervisory involvement in union organizing. Thus, the Plaintiff's the entire theory of a violation in this this case becomes specious and unworthy of 10(j) injunctive relief. *McKinney v Ozburn-Hessey Logistics*, 875 F3d 333 (6th Cir. 2017). The entire chain of events establishes only unprotected conduct under the NLRA, as

it significantly compromised patient care for hundreds of patients on March 9th. A strike or walkout for the alleged discharge of a supervisor who had in fact resigned, is not protected activity under the Act. *See Dobbs House, Inc*, 325 F2d 531 (5th Cir. 1963); *Smithfield Packing, Inc v NLRB*, 510 F3d 07 (4th Cir. 2007); *American Art Clay Company*, 328 F2d 88 (7th Cir. 1964).

Second, there is no evidence the Hospital had knowledge of any protected activity related to the walkout as not a single employee mentioned they left for any union related reason or were otherwise engaging in any protected concerted activity. *Meijer, Inc. v. N.L.R.B.*, 463 F.3d 534, 541 (6th Cir. 2006)("It has long been the law in our circuit that an employer cannot be held in violation of § 8(a)(1) of the Act when it discharges an employee for activity which may in fact be protected under the Act but the employer lacks knowledge of its protected character") (citations omitted). **Even if employees left due to Tinsley's resignation that is not enough to establish an 8(a)(1) violation.** *See Henning & Cheadle, Inc. v. N.L.R.B.*, 522 F.2d 1050, 1055 (7th Cir. 1975) (employer did not violate NLRA when it terminated employees it believed walked out in response to supervisor's "forced" resignation).

Additionally, there is no evidence the Hospital harbored any anti-union animus. Importantly, employees that followed the call-off procedure were not terminated. For those reasons, Plaintiff's unlawful termination claim does not support injunctive relief.

### 3. The Walkout Was Unprotected As It Endangered Patient Care.

"Section 7 has been interpreted not to protect concerted activity, whether incident to a strike or otherwise, to destroy property or endanger life or limb." *E. Chicago Rehab. Ctr., Inc. v. N.L.R.B.*, 710 F.2d 397, 404 (7th Cir. 1983). **Indeed, the Supreme Court recently said the right to strike is not absolute and "the NLRA does not shield strikers who fail to take 'reasonable precautions' to protect their employer's property from foreseeable, aggravated, and imminent danger due to the sudden cessation of work.** *Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Loc. Union No. 174*, 598 U.S. 771, 780, 143 S. Ct. 1404, 1413, 216 L. Ed. 2d 28 (2023) (citing *Bethany Medical Center*, 328 NLRB 1094 (1999) ("concerted activity" is "indefensible where employees fail to take reasonable precautions to protect the employer's plant, equipment, or products from foreseeable imminent danger due to sudden cessation of work") In the medical  context, a strike is unprotected when it endangers a facility's patients. *E. Chicago Rehab. Ctr., Inc. v. N.L.R.B.*, 710 F.2d 397, 404 (7th Cir. 1983).

There can be no dispute that the walkout seriously endangered patients. Trombly testified that when she and the other Phlebotomists closed the West Arbor location, there were patients waiting to have their blood drawn. (**Ex. 2**, Tr. at 692). These employees left knowing the lab would close as a result. (**Ex. 2**, Tr. at 730-31). They locked the door so other patients could not enter the lobby. (**Ex. 2**, Tr. at 1179).

These employees's actions were directly felt by patients, all of whom were there to obtain important testing ordered by their physicians. At the West Arbor location, there was only one blood draw on March 9, compared to the 59 the day before. (**Ex. 18**). That single blood draw was well below the Arbor Park average of thirty-three blood draws per day. (**Ex. 18**). Indeed, every single Outpatient Lab Facility affected by the unauthorized strike saw a substantial decrease in patient blood draws from from the average blood draws per day at that location. (**Ex. 18**). There is no question that the walkout prevented a significant number of patients from obtaining critical medical services. Thus, the walkout was unprotected under the Act.

### 4. The Allegations Concerning Tinsley And Fuciarelli Are Meritless Because They Are Both Supervisors And Their Involvement In The Union Organizing Was Unlawful.

Tinsley and Fuciarelli are both supervisors as defined by the Act. It is well-established that a manager or supervisor is not protected if they organize or engage in union activity. *Automobile Salesmen's Union Local 1095 v. N.LR.B*, 711 F.2d 383, 387 (D.C. Cir. 1983) ("Board's construction takes into account the fact that a supervisor is not protected if he engages in union or concerted activity"); *see also Beasley v. Food Fair of N. Carolina, Inc.*, 416 U.S. 653, 662, 94 S. Ct. 2023, 2028, 40 L. Ed. 2d 443 (1974) (discharge of supervisor for union membership not unlawful); *Domestic Linen Supply & Laundry Co. v. Cent. States, Se. & Sw. Areas Pension Fund*, 722 F. Supp. 1472, 1476 (E.D. Mich. 1989) (employers are free "to

discharge supervisors for their union membership and activities."). Under Section 2(11) an employee is a supervisor if: (1) they hold the authority to engage in any 1 of the 12 listed supervisory functions; (2) their "exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment," and (3) their authority is held "in the interest of the employer." *N.L.R.B. v. Kentucky River Cmty. Care, Inc.*, 532 U.S. 706, 713, 121 S. Ct. 1861, 1867, 149 L. Ed. 2d 939 (2001) Those 12 supervisory functions include, but are not limited to, hiring, assigning, responsibly directing employees, or effectively recommending such action. 29 U.S.C. § 152(11). To "exercise 'independent judgment' an individual must at minimum act . . . free of the control of others and form an opinion or evaluation by discerning and comparing data." *Id.* at 692-693.

In addition to these primary factors, the Board also considers secondary factors such as the attendance at supervisor meetings, granting time off, and other factors suggesting that the alleged supervisor possesses a status separate and apart from rank-and-file employees. *Pratt Towers, Inc.*, 338 NLRB 61, 71 (2002).

It is not disputed that Tinsley was a supervisor; Plaintiff admits this in the formal complaint. The standard is easily met for Fuciarelli: she scheduled and reassigned employees between labs on a daily basis, both as part of the regular schedule and to account for any staffing shortages. (**Ex. 2**, Tr. at 770, 847-48); *see also In Re Oakwood Healthcare, Inc.*, 348 NLRB 686, 689 (2006) (construing the

34

term "assign" under section 2(11) as "the act of designating an employee to a place (such as a location, department, or wing), appointing an employee to a time (such as a shift or overtime period), or giving significant overall duties, i.e., tasks, to an employee.") Fuciarelli was also involved in interviewing potential candidates and making recommendations for hiring, discipline, and promotions. (**Ex. 2**, Tr. at 852; **Ex. 3**). Fuciarelli routinely received and approved PTO requests. (**Ex. 2**, Tr. at 845). Fuciarelli was responsible for overseeing the day-to-day quality, quantity, and promptness of Lab Techs and Patient Service Representatives. (**Ex. 3**). She also had authority to close Outpatient Lab Facilities. Fuciarelli did not need permission to carry out any of these duties she simply exercised her independent judgment.

In addition, The Sixth Circuit has described the ratio of supervisors to non-supervisory employees as one of the "guiding lights" in determining supervisory status under the Act. *Beverly California Corp. v. N.L.R.B.*, 970 F.2d 1548, 1555 (6th Cir. 1992). Indeed, in *Beverly California Corp.*, the Sixth Circuit noted that the ratio of 1 supervisor to 27 non-supervisors was implausible in the healthcare context. *Id.* at 1556. As the court put it, "[t]hat is simply no way to run a business of this type." *Id.* If Fuciarelli and Reed were not supervisors that would leave only one person – Tinsley – as the supervisor for over 74 Outpatient Facilities employees far beyond the ratio discussed by the Sixth Circuit. Therefore, her actions on March 9, as well as the actions of Tinsley, were not protected and there is no violation of the Act.

### 5.  Plaintiff's Surveillance Claim Is Meritless.

It has long-established that an employer's act of observing its employees on company property during union activities, even when done in close proximity to its employees, is not a per se violation of the Act. *Intertape Polymer Corp. v. NLRB*, 801 F.3d 224, 235 (4th Cir. 2015). On the contrary, "union representatives and employees who choose to engage in their union activities at the employer's premises should have no cause to complain that management observes them." *Belcher Towing Co. v. NLRB*, 726 F.2d 705, 709 (11th Cir.1984). The exception to this general rule arises when the employer's observation of union activities can be reasonably construed as excessive or coercive surveillance, such that it "unreasonably chill[s] the exercise of the[ ] employees' Section 7 rights." *NLRB v. Southern Md. Hosp. Ctr.*, 916 F.2d 932, 938 (4th Cir.1990) (noting that "the Board has on several occasions found that employers unreasonably chilled the exercise of their employees' Section 7 rights through excessive surveillance"). The employer's observation must have a "reasonable tendency in the totality of the circumstances to intimidate" the employees. *NLRB v. Nueva Eng'g. Inc.*, 761 F.2d 961, 965 (4th Cir. 1985). "The test for determining whether an employer engages in unlawful surveillance, or unlawfully creates the impression of surveillance, is an objective one and involves the determination of whether the employer's conduct, under the [totality of the] circumstances, was such as would tend to interfere with, restrain, or

coerce employees in the exercise of their rights guaranteed under Section 7 of the Act." *Southern Md.*, 916 F.2d at 938.  Coon explained that she and Everett went to search for Fuciarelli's notebook to obtain scheduling information to see who was on duty when the Fraudulent Note was posted, and who should be interviewed about it. (**Ex. 2**, Tr. at 2599). But assuming arguendo the NLRB's theory that Coon and Everett looked for the notebook to ascertain Fuciarelli's union organizing involvement, such action is still **<u>not</u>** unlawful since she was a supervisor.

There is no evidence that the Hospital was surveilling employees in a way that would tend to interfere with, restrain, or coerce employees from exercising their protected rights. The search for the notebook was in a management office, during work hours without any evidence that it was intended to be concealed from employees at the facility. The search was limited to only open areas, within a single office, and no personal items were searched or touched. There was no expectation of privacy in the office and the Hospital had a lawful right to enter and search for the notebook. When viewed in the totality of the circumstances the search does not tend to interfere with, restrain, or coerce employees from exercising their protected rights.  Indeed, the union was voted in and certified after the search, thus belying any inference that it chilled union activity. Moreover, there is no allegation of any other search or actions that can reasonably be inferred to interfere with, restrain, or coerce employees from exercising their protected rights.

Moreover, upon learning that a supervisor (Fuciarelli) was keeping a list of alleged union supporters, in addition to the fact that the Fraudulent Note improperly threatened employees involved in union organizing activity, the Hospital was at least permitted **(if not obligated)** under the NLRA to investigate what its supervisor was doing, and possibly take appropriate action to ensure that election-interfering conduct[11] or unfair labor practices were not occurring. See *Pearson Educations, Inc*. 336 NLRB No. 92 (2001) (finding an unfair labor practice when employees were threatened with loss of promised wage increases and existing benefits in connection with union support.) The surveillance claim does not support injunctive relief.

### 6.  The Informational Meetings Were Not Unlawful.

Dating back to 1948, "captive audience" meetings discussing union representation have been permissible under the *Babcock & Wilcox Co.* decision. 77 NLRB 577 (1946). Such meetings are still lawful. See *Gissel Packing Co. v. NLRB*, 89 S.Ct. 1918 (1969)("an employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular

---

[11] It is well settled that supervisory involvement in union organizing (such as the supervisor's solicitation of union authorization cards) is a basis for invalidating the results of an NLRB election. *See Millard Refrigerated Services*, 345 NLRB 1143 (2005); *NLRB v Island Film Processing Co, Inc*, 784 F2d 1446 (9th Cir, 1986). Coercive supervisory conduct in support of union organizing is an unfair labor practice, creating NLRA liability for the employer. *Island Film Processing, supra*; *NLRB v Family Fare, Inc*, (unpublished), 205 Fed. Appx. 403 (6th Cir, 2006).

union, so long as the communications do not contain a 'threat of reprisal or force or promise of benefit."). Moreover, the meetings were not mandatory, participation was voluntary, and employees were free to attend at their own discretion. For those reasons, the "captive audience" claim does not support injunctive relief.

### 7.  The Wage Increase Had No Relation To Alleged Union Activity.

The Hospital did not violate Section 8(a)(1) by implementing a market-equity wage adjustment to align with the market rate for those positions. To be considered unlawful, a promise of a wage increase must have been made to persuade employees that the increase could be obtained either without the union's assistance, *NLRB v. Windsor Indus. Inc.*, 730 F.2d 860, 864 (2d Cir. 1984), or only if the union were rejected. *NLRB v. Rollins Telecasting, Inc.*, 494 F.2d 80, 84 (2d Cir.1974). The market-equity wage adjustment had no connection to any alleged union activity and Plaintiff has not pointed to any evidence that even infers a connection. The evaluation and implementation of the wage increases began in December 2022, before Plaintiff alleges any known union related activity took place and months before the Hospital could even have knowledge of any union activity. S*ee Consol. Printers, Inc.*, 305 NLRB 1061, 1067 (1992) (no 8(a)(3) or 8(a)(1) violation where employer made decision to reduce union hours before union election); *Alan Ritchey, Inc.*, 354 NLRB 628, 678 (2009) (no 8(a)(3) or 8(a)(1) violation where employer had no knowledge of union activity at time of decision to

terminate). The original request to review the broad wage increases was submitted on December 8, 2022. (**Ex. 2**, Tr. at 1614-1615, 2554). The request and subsequent increase included numerous positions, unrelated to any alleged union activity or the at-issue positions. Indeed, Advanced Practice Providers, Nurses, Surgical Technicians, Certified Registered Nurse Anesthetist, Surgical Technologist, Respiratory Therapists, Electroencephalographic Technologists, Pharmacy Technicians, and Pharmacy Interns, received wage increases. (**Ex. 2**, Tr. at 1614-1615). The amount of the increase depends on the level of the employee and their seniority but ranged from $0.12 per hour to $3.08 per hour. (**Ex. 25**, Raise chart). There is absolutely no connection between wage increases and any union activity. The Hospital's market-equity wage adjustment does not support injunctive relief.

### 8. The Hospital's Work Rules Are Lawful And Lawfully Applied.

Plaintiff alleges that the Hospital's job abandonment rule is overbroad and therefore illegal. Plaintiff's claim is meritless and impractical. First, the Hospital refers to the 2023 case (NLRB Case No. 07-CA-295469), for which the Hospital previously resolved allegations regarding the provisions in the same Code of Conduct. Despite the NLRB doing an exhaustive review of the Code of Conduct and highlighting over 10 provisions that could be interpreted to be unlawful, the NLRB did not at any time raise any concerns with the Hospital's job abandonment rule. **In fact, policies addressing no call/no shows and walking off the job are lawful**.

See *Ontario Knife Co. v. NLRB*, 637 F.2d 840 (2d Cir. 1980) (Discharge of employee of nonunion plant for walking off the job after protesting a condition of employment did not violate provision of the National Labor Relations Act.); *Wilshire at Lakewood*, 343 NLRB 141, 144 (2004)(employer did not violate section 8(a)(1) by maintaining work rule prohibiting walking off the job in health care context). Plaintiff essentially alleges that the work rule is unlawful because it does not contain an NLRA disclaimer.  However, Plaintiff does not cite to any case law to support that position.  Plaintiff's allegations regarding the Hospital's job abandonment rule are meritless and do not support injunctive relief.

## C.   PLAINTIFF CANNOT ESTABLISH THAT INJUNCTIVE RELIEF IS JUST AND PROPER

If reasonable cause exists, (which it does not) the district court must determine whether injunctive relief is "just and proper." *McKinney v. Starbucks Corp.*, 77 F.4th 391, 397 (6th Cir. 2023). Relief "is just and proper where it is 'necessary to return the parties to status quo pending the Board's proceedings in order to protect the Board's remedial powers under the NLRA.'" *Id*. (quoting *Gottfried v. Frankel*, 818 F.2d 485, 495 (6th Cir. 1987)). The district court must then determine "whether achieving [the] status quo is possible." *Id*. (quoting *Gottfried*, 818 F.2d at 495). "[T]he status quo is the state of affairs existing before the alleged unfair labor practices took place." *Schaub*, 250 F.3d at 972 (quoting *Frye ex rel. NLRB v. Specialty Envelope Inc.*, 10 F.3d 1221, 1226 (6th Cir. 1993)).

**A court deciding whether such an injunction is "just and proper" applies traditional "equitable principles 'in the context of federal labor laws**. *Kreisberg*, 732 F.3d. at 141, 143. Injunctive relief is "just and proper," under the statute, when it is necessary to prevent irreparable harm or to preserve the status quo. *Id*. at 142. Relevant to this "just and proper" analysis is whether the employer is responsible for chilling organizing activity. *Id*.

> Proper composition of the bargaining unit, reinstatement of unlawfully discharged employees, and certification of the union as bargaining representative **are matters generally left to the administrative expertise of the Board**. We believe that measures to short-circuit the NLRB's processes should be sparingly employed. While it is true Congress implemented 10(j) to aid the Board in administration of national labor policy, its scope should not overpower the Board's orderly procedures.

*Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1192 (5th Cir. 1975) (emphasis added). Stated otherwise, "[i]f the trial court, in its discretion, does not believe that far-reaching mandatory relief would serve the purposes of the Act, it need not grant the full remedy requested by the Board." *Id*. at 1193. **Importantly, this "court may consider the special characteristics of health care institutions when determining an appropriate remedy."** *Frye v. Dist. 1199, Health Care & Soc. Servs. Union, Serv. Emps. Int'l Union, AFL-CIO*, 996 F.2d 141, 145 (6th Cir. 1993).

First, there is no allegation of any ongoing or reoccurring violations of the Act. Thus, the status quo is already preserved in that regard, and the Court need not take any action as to the ongoing interactions between Plaintiff, the Hospital, or any

of the Hospital's employees. There have been no alleged interruptions, grievances, or any allegations of misconduct by any party relating to the bargaining and negotiating process. **Plaintiff cannot point to any admissible evidence, other than speculation and conjecture, that an injunctive relief is necessary to "[c]ease and desist from interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them under Section 7 of the Act." [ECF No. 7, PageID.50].**

Second, reinstatement of the employees is especially not warranted here.  For the same reason that there are special rules for strikes at healthcare facilities, the same careful consideration should be given to reinstatement of employees in the healthcare industry.  The terminated employees cannot be trusted to carefully adhere to the patient care standards required by their former positions at the Hospital. The employees had abandoned patients in waiting rooms and in the parking lots, refused to provide the necessary medical care, and instead went to Applebee's to drink alcohol and celebrate putting a "dent" in the Hospital.  Those same employees cannot now be trusted to return to the Hospital after they endangered the Hospital's patients. Indeed, these employees were so proud of their abandonment of the patients that they returned to the Hospital the next day to pose for pictures for the union website. Since most of these employees worked in remote Outpatient Lab Facilities without any local direct supervision and they cannot now be trusted to independently,

43

without direct supervision, provide consistent and high-level medical care to the Hospital's patients.

Third, unlike the typical unfair labor practice charge and request for 10(j) relief, here there is substantial evidence that the party bringing the charge, the Union, committed unfair labor practices. There is substantial and credible evidence that the Union organized and supported the walkout. It is undisputed that if the Union organized or supported the walkout that a 10-day notice was required and if the notice was not provided it would constitute an unfair labor practice and unprotected activity. **However, even if this Court finds that the Union did not support or organize the walkout (which it did), the failure of the Union to immediately take steps to correct and disavow the walkout also constituted a violation of the Act**. See *Jeddo Coal Company*, 334 NLRB 677 (2001)(finding an unfair labor practice when the union "had knowledge of what the Local 803 pickets were doing [unlawful picketing] and thereafter failed to disavow their actions and take corrective action."). Here, Ricards testified she was updated about the walkout shortly after it occurred. (**Ex. 2**, Tr. at 56-57, 78) Ricards, as an agent for the Union and employees, had an immediate obligation to and instruct the employees to return to work or her inaction would constitute a ratification of the employees' action. However, because the Union and Ricards failed to take the required corrective action or disavow the walkout, the Union violated the Act.

Fourth, reinstatement is not warranted because the employees have not been employed by the Hospital for over nine months. This nine-month period is solely the result of Plaintiff's delay in seeking 10(j) relief. This passage of substantial time makes it impossible to preserve the status quo and makes injunctive relief inappropriate. *Boire*, 515 F.2d at 1193 ("The Board waited three months before petitioning the district court for temporary relief. Although the time span between commission of the alleged unfair labor practices and filing for 10(j) sanctions is not determinative of whether relief should be granted, it is some evidence that the detrimental effects of the discharges have already taken their toll on the organizational drive.") Just as in *Boire* and applicable here, reinstatement is not warranted because "[w]hether these employees were in fact dismissed for their organizational efforts will be determined by the Board when it brings the full panoply of its resources to bear upon issuance of the final order[.]" *Id*. *See Overstreet v. El Paso Elec. Co.*, 176 Fed. Appx. 607 (5th Cir. 2006) (Refusing to reinstate discharged employee, based on determination that the seven-months that elapsed allowed detrimental effect of discharge to be fully realized with no lingering threat of additional harm warranting injunctive relief.); *N.L.R.B. v. Hartman and Tyner, Inc.* 714 F.3d 1244 (11th Cir. 2013)(affirming district court denial of 10(j) relief when "it took the NLRB more than six months after the terminations and more than four months after the Union brought the terminations to the attention of the NLRB

to file its section 10(j) petition."); *Diaz v. Hartman and Tyner, Inc.*, 2012 WL 2513485 (S.D. Fla. June 29, 2012)("District Court denying 10(j) injunctive relief when The Board then waited *more than four months* before petitioning the Court for injunctive relief.")(emphasis in original). (**Ex. 26**)

Fifth, reinstatement of the employees would result in the displacement of the Hospital's current employees. The Sixth Circuit has held that interim reinstatement is not appropriate 10(j) relief when it would result in the displacement of current employees. *See Muffley ex rel. N.L.R.B. v. Voith Indus. Servs., Inc.*, 551 F. App'x 825, 833 (6th Cir. 2014); *Schaub v. Detroit Newspaper Agency*, 154 F.3d 276, 280 (6th Cir. 1998). For example, Fuciarelli's and Tinsley's positions have been filled by new managers. Reinstatement of management employees, that are not even covered by the NLRA, would directly result in the loss of employment for the employees that filled their positions. Reinstatement of the Lab Techs and Patient Service Representatives would also displace Lab Techs and Patient Service Representatives hired by the Hospital over the past nine months and would reduce the available working hours to those employees that are not displaced.

Sixth, specific to Tinsley, reinstatement is not appropriate because it was uncovered during the hearing that she provided wage increases to employees without the proper authority, in violation of Hospital policy. *John Cuneo, Inc*. 298 NLRB 856 (1990)(applying the after-acquired evidence defense to NLRA matters). Tinsley

provided additional pay to certain colleagues and then instructed them not to discuss the extra pay, in order to conceal her actions. (**Ex. 2**, Tr. at 527-531). Tinsley's actions were in violation of Hospital policy -- both the unauthorized wages increases and the instruction not to discuss the wages.  For that reason, Tinsley should not be reinstated.  In regard to the employees, under the Act, "[n]o order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause." 29 U.S.C. § 160(c). Thus, because the employees were discharged for Cause, reinstatement is not an available remedy.

Lastly, many of the employees have indicated they have no interest in returning to the Hospital. That includes Fuciarelli, Hammoud, Miller, Nielsen, and Terrell-Johnson. Moreover, although Wood indicated he wants to "see the Hospital pay for this!!" (**Ex. 21**). Ordering reinstatement of the employees that endangered patient care and that have no interest in returning is not just and proper. For those reasons, a preliminary injunction is not just and proper.

## D.   IF THIS COURT DOES NOT IMMEDIATELY DISMISS THE PETITION AN EVIDENTARY HEARING SHOULD BE HELD.

In the event this Court does not deny Plaintiff's Petition based on the written submissions, this Court should conduct an evidentiary hearing to determine whether to grant the preliminary injunction sought. See e.g., *Sheeran v. Am. Com. Lines, Inc.*, 683 F.2d 970, 972 (6th Cir. 1982) (the court granted some, but not all, relief sought

under section 10(j) after an evidentiary hearing); *Eisenberg for & on Behalf of N.L.R.B. v. Hartz Mountain Corp.*, 519 F.2d 138, 143 (3d Cir. 1975) (Evidentiary hearing "may be essential to informed decision whether an injunction would be in the public interest" under section 10(j)); *Hartman & Tyner, Inc.*, 714 F.3d at 1245 (11th Cir. 2013) (the Court denied the 10(j) petition in material part after "extensive briefing and an evidentiary hearing").

Presently, the Court does not have a complete transcript of the Hearing because the Hospital had yet to present its entire case at the time the NLRB filed this petition. See *Glasser v. Heartland--Univ. of Livonia, MI, LLC*, 632 F. Supp. 2d 659, 666 (E.D. Mich. 2009) (full evidentiary hearing not necessary on 10(j) petition where the court had a complete transcript of ALJ proceedings). Indeed, the hearing is still ongoing, and the Hospital still has not yet presented its entire case.

Moreover, during the hearing, the Hospital was denied basic due process rights in defense of its claims. Specifically, the Hospital sent subpoenas to the employees seeking text messages sent and received amongst themselves relating to their terminations and the walkout. However, in a bizarre act of gamesmanship, the terminated employees and Union alleged that they sent all the text messages to the NLRB and therefore they were not subject to the subpoenas' production requirements. Over the Hospital's objections, the ALJ refused to enforce the production of a single text message created, sent, or received, before March 9,

although the text messages were created entirely outside the NLRB's direction, were not within the NLRB's control at the time of their creation, and employees testified to the existence of the text messages. (See **Ex. 2**, Tr. 1478-1485). It is the Hospital's strong belief the text messages support the conclusion that the Union organized and supported the walkout. Accordingly, an evidentiary hearing is appropriate to allow the Hospital to mount a full and complete defense to Plaintiff's allegations in support of the 10(j) injunction request.

Accordingly, Plaintiff's Petition relies on an incomplete record and evidence cherrypicked by Plaintiff during the presentation of its case during the NLRB hearing. Due process and equity dictate that the Hospital should be provided an opportunity to present its defense during an evidentiary hearing.

## <u>CONCLUSION</u>

For each of the foregoing reasons, Plaintiff is not entitled to the extraordinary injunctive relief it seeks, and the Petition should be denied.

Respectfully submitted,

**BUTZEL LONG, P.C.**

Dated: December 29, 2023    By:    */s/ Terrence J. Miglio*
Terrence J. Miglio (P30541)
Barbara E. Buchanan (P55084)
Attorneys for Defendant
(248) 258-1616
miglio@butzel.com
buchanan@butzel.com

49

**Certificate of Service**

I hereby certify that on December 29, 2023, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing and service of said documents to all parties through their counsel of record.

*/s/ Terrence J. Miglio*
Attorney for Defendant
